# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 13-CV-5828 (JFB) (ETB)

## Michael Napoli,

Plaintiff,

versus

## 243 Glen Cove Avenue Grimaldi, Inc., d/b/a Grimaldi's Pizzeria, and Frank Ciolli,

Defendants.

### MEMORANDUM AND ORDER
September 6, 2019

Joseph F. Bianco, Circuit Judge (sitting by designation):

Plaintiff Michael Napoli ("plaintiff"), brings this action against 243 Glen Cove Avenue Grimaldi, Inc., and Frank Ciolli ("Ciolli") (collectively, "defendants"), asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., and the New York Labor Law ("NYLL"). Specifically, plaintiff alleges that defendants violated the following provisions of the FLSA: (1) by failing to pay plaintiff minimum wage and overtime compensation; and (2) by retaliating against plaintiff for filing the initial, first, and second amended complaints. Plaintiff also asserts claims under NYLL for: (1) failure to pay plaintiff minimum wage and overtime compensation; (2) failure to reimburse employment-related

expenses; and (3) for retaliation against plaintiff for the filing of the initial, first, and second amended complaints. Plaintiff further asserts unjust enrichment and *quantum meruit* claims. [1] In connection with these claims, plaintiff seeks a declaratory judgment that defendants' practices are unlawful under the FLSA and the NYLL, and an order finding defendants liable for unpaid overtime compensation and an equal amount of liquidated damages. Plaintiff also requests compensatory and punitive damages for violations of the anti-retaliation provisions of the FLSA. Finally, plaintiff requests an award, jointly and severally against defendants, for loss of compensation, financial harm, and other economic loss.

A bench trial was held on November 13, 15, and 19, of 2018, as well as on February 1,

---

[1] At the summary judgment stage, plaintiff consented to dismissal of all claims against 1 Front Grimaldi, Inc., as well as the fiduciary duty claim against defendants. (ECF No. 68, at 25.)

2019. Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes, after carefully considering the evidence introduced at trial (including assessing the credibility of the witnesses based upon their demeanor and their answers to questions in light of all the evidence in the case), the arguments of counsel, and the controlling law on the issues presented, that plaintiff has not met his burden of proof on any of his claims. As such, plaintiff is not entitled to any relief. In particular, the Court finds Ciolli's testimony to be credible on each and every one of the key elements in the case and was often corroborated by other evidence in the case, including plaintiff's own testimony in many instances. Based upon all of the evidence, plaintiff has failed to prove by a preponderance of the evidence that Ciolli acted as an employer under either the FLSA or NYLL. As discussed in detail below, the credible evidence demonstrates that plaintiff had the power to hire and fire employees, supervised and controlled employee work schedules and conditions of employment, determined the rate and method of payment, and maintained Grimaldi's pizzeria's (the "Restaurant") employment records. Ciolli's investment and involvement in the Restaurant was part of an oral joint venture agreement that he had reached with the plaintiff regarding the opening and operation of the Restaurant where, as a result of the time and money both were expending, they would share equally (50/50) in the profits of the Restaurant. Under the circumstances of this case, it is clear that no employer/employee relationship existed between Ciolli and plaintiff. Accordingly, judgment is warranted in defendants' favor on all of the FLSA and NYLL claims. Similarly, given the financial arrangement agreed upon by plaintiff and Ciolli, plaintiff has failed to prove his quasi-contract claims and judgment in favor of defendants is warranted on such claims.

I. BACKGROUND

On October 22, 2013, plaintiff filed his complaint alleging violations of the FLSA and NYLL. (ECF No. 1.) On December 18, 2013, plaintiff filed his first amended complaint. (ECF No. 5.) On March 7, 2014, plaintiff filed his second amended complaint. (ECF No. 25.) On April 1, 2014, defendants moved to dismiss the complaint. (ECF No. 28.) The Court denied this motion in its entirety on May 7, 2014. Plaintiff then filed his third amended complaint on May 14, 2014. (ECF No. 37.) Defendants answered on May 28, 2014. (ECF No. 40.) On October 30, 2015, the parties filed cross-motions for summary judgment. (ECF Nos. 56, 62.) On May 23, 2016, the Court denied both parties' summary judgment motions. (ECF No. 88.)

The Court held a bench trial on November 13, 15, 19, 2018, and February 1, 2019. [2] Plaintiff, John Napoli, plaintiff's brother, and Roger DeBonis, a former assistant to Ciolli, testified for plaintiff. [3] Ciolli and Michael Feldman, Ciolli's accountant, testified for defendants. During the trial, both sides also submitted exhibits to be considered by the Court. Finally, the parties submitted proposed findings of fact and conclusions of law, as well as other memoranda, to the Court.

The Court has fully considered all of the evidence presented by the parties, as well as their written submissions. Below are the Court's Findings of Fact and Conclusions of Law.

_____

[2] Both sides consented to a bench trial. (*See* Joint Stipulation and Order, ECF No. 116.)

[3] Ciolli was called for plaintiff as well.

## II. Findings of Fact

The following section constitutes the Court's Findings of Fact[4] pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial and the parties' trial exhibits.

### A. The Formation of Grimaldi's

In 1996, Ciolli acquired the corporation Pattabe, which owns the Grimaldi's Pizzeria in Brooklyn, New York, as well as the Grimaldi's trademark. (Tr.[5] 14:13-16:20.)

Around 2000, the Grimaldi trademark was transferred to JMC Restaurant Holdings, a corporation with Ciolli owning 49% and his son, Joseph Ciolli, owning 51%. (Tr. 17:07-18:18.) On March 9, 2011, Ciolli and Joseph signed the Intellectual Property License Agreement ("the Agreement").[6] (Tr. 21:17-24:13; Pl. Ex. 3.) The Agreement provided that any use of the intellectual property at additional locations was at the sole discretion of JMC and required that defendant Frank Ciolli wholly own the restaurant business operating at the additional location. (Pl. Ex. 3 at 1.) The Agreement also mandated that Ciolli had to maintain all services associated with the trademark, at a high-quality standard "reasonably acceptable to JMC." (*Id.* at 2.) Ciolli testified that he entered into this Agreement in order to help his son "grow his

end of the business and borrow money." (Tr. 29:01-03.) Since signing the Agreement, Ciolli has opened two additional locations. For each new location, he created a corporation, of which he owns 100%, and had an operating partner to assist with running the store, who was compensated through a share of the profits. (Tr. 98:07-99:13.)

### B. Agreement Between the Parties

In or around 2011, plaintiff and Ciolli discussed opening a Grimaldi's pizzeria (the "Restaurant") in Sea Cliff, New York. (Tr. 135:14-138:04.) On March 29, 2012, Ciolli created the defendant corporation 243 Glen Cove Avenue Grimaldi, Inc. (the "Corporation"), to facilitate ownership of the pizzeria. (Tr. 36:16-36:22.) Ciolli was the sole shareholder of the Corporation, never issuing any shares. (Tr. 37:09-23.)

Ciolli and plaintiff agreed that plaintiff would be an operating partner of the Restaurant, splitting 50% of any potential profits, while Ciolli would maintain ownership of the Grimaldi name and property.[7] (Tr. 35:17-19.) Plaintiff testified that he understood the profit-sharing arrangement, and it was an incentive for him to enter the business arrangement with Ciolli. (Tr. 208:16-22.)[8] After this oral agreement was reached, plaintiff expended over $155,000 of his own money in building the

---

[4] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

[5] This citation references the Trial Transcript ("Tr.") referring to the page of the transcription followed by the line on the page. For example, 14:13 refers to line 13 on page 14.

[6] The Agreement lists four pizzerias in: (1) Brooklyn, New York; (2) Douglaston, New York; (3) New York, New York; and (4) New York, New York.

[7] Ciolli testified that he had this same arrangement – whereby he was the sole owner and there was an operating partner – at two of his other Grimaldi locations. (Tr. 98:07-99:13.)

[8] Specifically, plaintiff was asked, "At the time that you had discussed with Mr. Ciolli your salary, you also understand that you were supposed to be getting 50/50 with regards to profits, correct?" Plaintiff responded, "Correct." Plaintiff was then asked, "And that was your incentive to get into this business, correct?" Plaintiff responded, "Hopefully that it would lead to ownership, yes."

Restaurant.[9] (Tr. 173:20-175:17; Pl. Ex. 5.) Plaintiff also testified that Ciolli had introduced him as a partner and had told plaintiff that they had both "built a hell of a place." (Tr. 187:02-07.)

Plaintiff testified that, in addition to the profit-sharing arrangement, Ciolli stated that he would give plaintiff a small salary for a short period of time before the Restaurant opened.[10] Ciolli denied that such a conversation took place. The Court finds Ciolli's testimony to be credible, and there is no credible evidence in the record to support plaintiff's contention. In fact, plaintiff acknowledged that he did not request a salary check from Ciolli after both his first and second week of work on the Restaurant. (Tr. 212:10-16.) Plaintiff further acknowledged that he did not make any request for his salary after a year and a half of work prior to the Restaurant opening. (Tr. 214:06-13.) In other words, despite the fact that plaintiff claimed that he worked seven days a week from 9:00 a.m. to 4:00 p.m. between July 1, 2011 (when the lease began) to the opening of the Restaurant in January 2013 (Tr. 149:05-25), plaintiff never requested or inquired as to the circumstances surrounding his purported salary. In short, based upon all the testimony and evidence in this case, the Court finds that Ciolli did not offer plaintiff a salary for any period of time, but rather their

agreement involved only the above-referenced profit-sharing arrangement.

## C. Preparation for Opening

### 1. Ciolli's Role

On June 21, 2011, Ciolli signed a lease – for July 1, 2011 to June 30, 2021 – for 243 Glen Cove Avenue, Sea Cliff, New York with Samiano Realty Corporation with Sal Imbriano ("Imbriano), the property's landlord. (Tr. 38:18-39:11, Pl. Ex. 6.) Plaintiff was not at the meeting when the lease was signed, nor was he involved in lease negotiations. (Tr. 139:11-140:04.) In order to assist with the renovations, an architect was hired. (Tr. 141:22-25.) Plaintiff recommended that one particular architect, out of three options, would be "best to serve" the parties. (Tr. 142:06-12.) Ciolli made the final decision to enter into a written contract with plaintiff's suggested architect. (Tr. 42:08-24.) Ciolli also hired a plumber and an electrician for the renovations, both of whom were friends of plaintiff. (Tr. 43:13-19, 102:18-22.) Ciolli retained parking spaces across the street from the Restaurant. (Tr. 44:01-19.) Ciolli also submitted disability insurance forms to the Health Department (Tr. 45:7-16.) The Restaurant received equipment from the other pizzerias owned by Ciolli prior to opening. (Tr. 160:05-24.)

---

[9] Plaintiff asserts that Ciolli should be considered the "only investor in the Restaurant." (Pl. Find. of Fact, ECF No. 135 ¶ 17.) Plaintiff cites to Ciolli's testimony for this argument where when asked if he invested any of his own money in the Restaurant, Ciolli replied, "*As far as I know*, I'm the only investor." (Tr. 76:25-77:01.) (emphasis added). That appears to be a reference to the fact that Ciolli never required any investment from plaintiff with respect to the profit-sharing arrangement and, thus, any money plaintiff spent on the Restaurant was voluntary. Regardless of whether plaintiff is labelled an "investor," it is clear from the evidence in the record that he voluntarily

spent a substantial sum in building the Restaurant (and making it operational) because he hoped that such expenditures would lead to a substantial profit pursuant to his joint venture with Ciolli by which plaintiff would receive 50% of the profits.

[10] Plaintiff testified that he was not able to recall the specific amount, but approximates that it was between $800 and $1,000 for an undefined period of time. (Tr. 172:07-12, 173:6-11, 207:16-20.) Plaintiff also testified that any salary would be "for a short period of time." (Tr. 173:08-09.)

Additionally, Ciolli suggested that plaintiff meet with individuals at other Grimaldi's locations to learn what purveyors to use (Tr. 46:11-47:11, 49:01-16), and offered to train the any of the Restaurant's employees selected by plaintiff at one of the other Grimaldi locations. [11] (101:14-16.) However, Ciolli testified that very few individuals were actually trained and only on one or two occasions. (Tr. 50:20-51:06.) Ciolli approved additional menu items favored by plaintiff. [12] (Tr. 50.02-14, 107:18-108:05.)

### a. Mr. Feldman's Discovery and Firing

Prior to opening, Ciolli sent his accountant, Mr. Feldman, to oversee the Restaurant's financial statements and assist plaintiff with payroll. (221:18-223:07.) Plaintiff testified that he viewed Mr. Feldman as Ciolli's "right-hand man." (Tr. 161:13-19.) Mr. Feldman worked from around December 2012/January 2013 until around March/April 2013. (Tr. 224:10-16.) Mr. Feldman credibly testified that, during his review of the Restaurant's finances, he discovered improper uses of Restaurant funds by plaintiff. (Tr. 225:02-20.) [13] Mr. Feldman confronted plaintiff, telling him that these expenses would have to be recouped from plaintiff's monetary investment. (Tr. 225:07-13.) Plaintiff denies improper spending and testified that he thought his wife might have used the Restaurant's card and once Mr. Feldman informed him, he "yelled and screamed at her." (Tr. 246:08-247:06.)

There is a dispute as to the justification for plaintiff's firing of Mr. Feldman. Plaintiff testified that he fired Mr. Feldman because Mr. Feldman, without authorization, paid himself from Restaurant funds, forging plaintiff's signature. (Tr. 164:04-09.) However, plaintiff also testified that he was not in the Restaurant at the time of this supposed theft and provides no other evidence regarding this alleged misappropriation. Conversely, Ciolli testified that plaintiff justified Mr. Feldman's firing because he felt that he charged too much, and plaintiff could find a better accountant. (Tr. 113:09-13.) The Court concludes that the reason for Mr. Feldman's termination is immaterial to the issues in this case; rather, the material fact (which the Court finds) is that plaintiff made the independent decision to terminate Mr. Feldman without any approval from Ciolli.

### 2. Plaintiff's Role

After terminating Mr. Feldman, plaintiff hired his own accounting firm, Kempisty and Company, whose services were used until the Restaurant closed. (Tr. 259:20-23, 267:24-25.) Plaintiff testified that the new accountant did not report to Ciolli (Tr. 260:06-09), and Ciolli never met this accountant (Tr. 114:04-07). This accounting firm calculated all the payments made by plaintiff, Ciolli, and the Restaurant, itself, up until December 31, 2012. Plaintiff spent $155,664.71 of his own money on the construction and operation of the Restaurant. (Tr. 173:20-175:17, Pl. Ex. 5.) Those expenses included $27,976.98 in food

---

[11] Plaintiff testified that at least four employees were trained at the Grimaldi's Douglaston location. (Tr. 158:19-159:15.)

[12] Ciolli testified that plaintiff "felt he could attract more people if he had a little more stuff on the menu." (Tr. 107:23-24.)

[13] For example, Restaurant funds were spent on restaurant visits, nail salons, jewelry, and eyeglasses. (Tr. 225:07-19, 245.)

purchases and $29,678.85 in repairs and maintenance. (Pl. Ex. 5.)

In preparation for the Restaurant's opening, plaintiff signed permits to the Village of Sea Cliff – listing himself as the owner or president. (Tr. 251:15-23; Exs. B, D.) Plaintiff also appeared before the Village of Sea Cliff town council review boards three times, when applying for these permits, without discussing any of these appearances with Ciolli or disclosing that he was not, in fact, the owner but was merely Ciolli's representative. (Tr. 165:15-166:02, 272:05-273:01.) In conjunction with this process, plaintiff submitted a special use permit with his signature as owner, but claimed that the architect filled out the forms prior to his signature. (Tr. 271:22-272:23.)

Plaintiff also filled out and signed the Restaurant's worker compensation forms, signing as "president" and listing himself and Ciolli as the Restaurant's officers. (Tr. 251:07-14; Def. Ex. D.) Other forms were submitted and plaintiff testified that they were filled out and submitted by the architect or the plumber.[14] (Tr. 166:06-169:17.) Ciolli testified that he had no idea who submitted these forms. (Tr. 73:09-76:01.) The Court notes that, even assuming that plaintiff did not see each of these forms, it is clear from the credible evidence in the record that he knowingly signed multiple municipal forms in which he represented himself as the owner or president of the Restaurant. Plaintiff also opened Grimaldi's corporate checking account as the sole signatory (Tr. 214:18-25), and plaintiff acknowledges that he had "free reign" on this account "so long as it was for the business" (Tr. 248:14-16).

Although Ciolli recommended certain purveyors, plaintiff had discretion in where to purchase supplies for the Restaurant. (Tr. 217:03-05.) For instance, plaintiff chose a different coal purveyor due to its reduced cost. (Tr. 217:03-05.) Ciolli also testified that plaintiff chose "his own people" based on cheaper ingredients and this was negatively impacting the Restaurant's product but he did not interfere. (Tr. 48:07-48:12.) Plaintiff also solely possessed the keys to the Restaurant. (Tr. 104:02-04.)

Plaintiff, in an attempt to obtain a liquor license, also executed a fraudulent second lease with Imbriano in his own name. (Tr. 170:02-171:10, 256:21-257:01; Pl. Ex. 7.) Plaintiff testified that he spoke to Ciolli prior to signing the fraudulent lease. (Tr. 170:02-171:10.) Ciolli testified that he only found out about this second lease through his attorney and was angered, but could not fire plaintiff due to the fact that plaintiff was an associate and not employee. (Tr. 108:12-110:25.) The Court found Ciolli's testimony on this issue to be credible, but it is immaterial to the Court's determination.

### 3. Opening and Control Over the Restaurant

Plaintiff credibly testified that he—— without any input from Ciolli—interviewed various people for job openings, set their work schedules, and bought a time clock to allow these employees to check in and out. (Tr. 215:01-10.) Plaintiff bought the clock to ensure that the Restaurant's payroll would avoid any labor law violations. (Tr. 215:11-16.) Plaintiff never put himself on payroll or drew any salary, nor did Ciolli tell him to draw a salary. (Tr. 215:17-24.) Ciolli also

---

[14] This included a "short environmental assessment form" (Pl. Ex. 10), a "notice of disapproval / review required" which was signed by plaintiff (Pl. Ex. 11), and two "change of contractor/plumber or other professional" forms also signed by plaintiff (Pl. Exs.

17, 18). Plaintiff testified that he only discussed the Ex. 18 form with the plumber prior to signing it. (Tr. 169:08-17.)

credibly testified that plaintiff interviewed all the Restaurant's employees, while setting their schedules and rates of pay. (Tr. 104:05-14.) Ciolli never set plaintiff's work schedule. (Tr. 104:07-09.) Plaintiff also had discretion to fire employees. As explained earlier, he fired Mr. Feldman, Ciolli's accountant, without any consultation or approval from Ciolli. (Tr. 111:21-113:13.) Moreover, Ciolli did not demand Mr. Feldman's reinstatement. (Tr. 113:14-21.)

In January 2013, three online articles discussed the opening of the Restaurant. (Pl. Exs. 13-15.) In each article, plaintiff is quoted and referred to as the Restaurant's owner. (Pl. Exs. 13-15.) Plaintiff testified that he never told a reporter that he was the owner, nor made any of the quoted statements in the articles, only meeting one reporter from a Sea Cliff Village paper. (Tr. 184:24-186:12, 273:06-274:23.) Plaintiff also testified that he never saw any of these articles and, therefore, did not request any corrections regarding the references to him as the owner. (Tr. 275:18-276:03.) The Court does not find plaintiff's testimony on this issue to be credible based upon his demeanor and the other credible evidence in the record (including government forms), where he represented himself to be an owner or president of the Restaurant. In any event, the fact that he represented himself at times to be the owner and/or president of the Restaurant is not a critical part of the Court's legal analysis discussed *infra*.

The Restaurant was open from January 2013 until March 2014 (Tr. 87:02-07, 259:10-13), and served lunch and dinner from 12:00 p.m. to roughly 10:00 p.m., excluding certain holidays and other periodic closings (Tr. 155:19-156:09). Plaintiff copied these operation hours off the menu from the Grimaldi's in Douglaston. Plaintiff does not recall any discussion with Ciolli about the hours. (Tr. 156:10-16.) Ciolli was

not at the opening of the Restaurant. (Tr. 65:17-18.) Ciolli testified that he learned of the opening date from Mr. DeBonis who called Ciolli to inform him that Mr. DeBonis would be attending the opening. (Tr. 66:02-03.) Ciolli testified that he told plaintiff that he thought the Restaurant was not ready and that it should not be opened in January or February as these are "dead months" for business and should, instead, be opened in the spring. (Tr. 66:07-10, 114:18-115:10.) Plaintiff opened it anyway, without Ciolli's approval. (Tr. 65:21-66:03.) Plaintiff testified that he told Ciolli about his decision to open the Restaurant in January 2013. (Tr. 242:15-20.) Plaintiff did not testify as to whether Ciolli opposed his decision to open in January as Ciolli claims. In any event, based upon the credible testimony, the Court concludes that plaintiff informed Ciolli that he intended to open in January. Ciolli, in turn, expressed his concerns. Despite these concerns, plaintiff went ahead with his initial plan and then Mr. DeBonis informed Ciolli of the specific date of the Restaurant's opening.

Mr. DeBonis also credibly testified, in addition to Ciolli, that it was plaintiff who was making personnel decisions. For example, plaintiff decided who was hired for opening night and task allocation (*i.e.*, who operated the takeout section of the Restaurant). (Tr. 62:01-08.) Mr. DeBonis explained that he knew that plaintiff would be making these sorts of decisions because it "was made clear that as with all of these other stores, [Ciolli] is the owner, that was made clear from day one, and this was a partnership in which [plaintiff], in this case, would be the operator, and he would run day-to-day operations. And they had some financial, you know, deal that I was never privy to[.]" (Tr. 62:14-19.)

Plaintiff later failed to pay the Restaurant's rent, resulting in both plaintiff

and Ciolli being locked out of the property. (Tr. 179:06-08, 115:17-19.)

D. Meeting at Diner

In February 2014, months after this litigation had commenced, plaintiff, Ciolli, plaintiff's wife, and Imbriano (the property's landlord) met at a diner. (Tr. 80:12-22, 187:14-189:20, 235:05-236:02, 189:20-23.) The purpose of the meeting was to resolve the issue of the Restaurant's unpaid rent. (Tr. 80:14-81:03, Tr. 116:15-20.) Ciolli also testified that during this meeting he expressed his concerns with the way plaintiff was operating the Restaurant and offered to take over the operation and, in exchange, pay plaintiff what he thought was owed to him. (Tr. 235:08-236:01.) Plaintiff had this meeting recorded on his phone unbeknownst to the other participants besides his wife and Imbriano. (Tr. 188:2-189:05, Tr. 199:17-200:03.)

During this conversation, Ciolli said to Imbriano that "[plaintiff] asked you to call me because you didn't get paid January's rent." (Pl. Ex. 19.)[15] Ciolli and plaintiff then argued about who paid for certain items in the Restaurant. (Ct. Ex. 7:02-12:19.) [16] Ciolli referred to plaintiff as "an associate" when conversing with Imbriano. (Ct. Ex. 12:08.) As a possible remedy to the Restaurant's problems, Ciolli told plaintiff that he (plaintiff) could "buy [Ciolli] out" and "take over the business" but Ciolli would have to "remove the name Grimaldi." (Ct. Ex. 13:03-05.) The two then discussed whether plaintiff was asking Ciolli to pay the unpaid rent and, during that discussion, plaintiff stated, "It's up to you. It's your store. As you made it very

clear" to which Ciolli responds, "Well, I'll accept your resignation." (Ct. Ex. 15:04-06.)

Ciolli then offered to "take over the place" himself and to "make money and pay [plaintiff] back from the business," asking that plaintiff first surrender him the keys. (Ct. Ex. 18:05-10.) Ciolli further stated to plaintiff that he "know[s] how much extra it cost [him] because of [plaintiff's] involvement on a voluntary basis to get the place built," and further explained, "I didn't argue with you, I didn't fight with you, you didn't listen to me, you did what you wanted and you cost me a lot of extra money, and I paid" but also noted that he was "willing to work with [plaintiff]." (Ct. Ex. 18:18-24.) Ciolli then told Imbriano that he would pay the back rent, but it would come from him personally and not the Restaurant. (Ct. Ex. 20:14-17.) Ciolli said, "I no longer want to be in a position where I have to keep paying things and everything's gone the way I don't like it." (Ct. Ex. 20:21-23.)

Plaintiff expressed that he had money invested as well, with Ciolli responding, "Not by my request. Listen, if you wanna take money and throw it in the street or give it away to somebody don't bother me. You're not a partner. I have no responsibility for what you do. The only place I get responsible is what you do in the store, because I own it. Other than what you're doing in the store, I have no responsibility for you. You're not my partner and have never been my partner. If you think you're a partner or an owner, you're mistaken." (Ct. Ex. 22:23-23:06.) Plaintiff responded, "I was mistaken. I told you that in the office...." (Ct. Ex. 23:07.) Ciolli added, "We were never partners. And the fact of employ, you're not my employee either .... I didn't hire you. We had an

---

[15] The Court has reviewed the entire recording, but only refers to the relevant portions here.

[16] The Court has filed plaintiff's transcription (which was accurate) as an attachment to this Order.

agreement, you were gonna run the store for 50% of the profits. That was the deal." (Ct. Ex. 23:11-17.)

The parties then discussed meeting in the near future about possible resolutions. Within two weeks of this meeting, plaintiff listened to the entire recording, confirming that the conversation was captured accurately. (Tr. 190:18-191:03.) Then plaintiff, without altering the recording, gave it to his brother, John Napoli, who, in turn, gave it to his assistant. The assistant then used a court reporter service to have it transcribed. (Tr. 123:25-124:17.)

After the diner meeting, Ciolli paid Imbriano $30,000 in order to re-open the Restaurant. After about three months of operation, Ciolli then closed it permanently. (Tr. 237:16-21.)

### III. BURDEN OF PROOF

Plaintiff has the burden of proof in this case on each and every claim, as well as on the issue of damages. He must prove by a preponderance of the evidence that defendants did not adequately compensate employees as required by the FLSA and NYLL. *See Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("[Plaintiff] must produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'" (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946))). Plaintiff also must also prove by a preponderance of the evidence that defendants violated the anti-retaliation provisions of the FLSA and NYLL; failed to reimburse employment-related expenses under NYLL; and that defendants were unjustly enriched by plaintiff's services.

Finally, plaintiff must prove the amount of damages by a preponderance of the evidence.

### IV. CONCLUSIONS OF LAW

#### A. Admissibility of Diner Recording

Plaintiff has offered a recording of the February 2014 diner meeting. A transcript of this recording was also provided to the Court. (*See* Ct. Ex.) Excerpts of this recording were played at Mr. Ciolli's deposition, at which he confirmed his voice and the voices of other individuals on the recording (Ciolli Dep. at 135-45.) Defendants argue that the statements made at this meeting were made during a settlement discussion, and thus, are privileged under Rule 408 of the Federal Rules of Evidence ("FRE 408"). Plaintiff argues that the relevant portions of the conversation fall outside FRE 408 because they do not involve settlement discussions about the present dispute, but as to the issue of the Restaurant's unpaid rent. Alternatively, plaintiff argues that the recording is admissible to impeach Ciolli's credibility regarding the employer-employee relationship.

Rule 408 of the Federal Rules states:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable

merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. As the Second Circuit has stated "[i]t is often difficult to determine whether an offer is made in compromising or attempting to compromise a claim. Both the timing of the offer and the existence of a disputed claim are relevant to the determination." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992); *see also Eviner v. Eng*, No. 13-CV-6940-ERK, 2015 WL 4600541, at *7 (E.D.N.Y. July 29, 2015). In *Pierce*, the Second Circuit clearly stated that "where a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408." 955 F.2d at 827. However, courts have also found that "communications between the parties themselves may also come within the scope of the Rule" when they are made in an effort to settle litigation. *Eviner*, 2015 WL 4600541, at *7 (finding voicemails left between parties soon after receiving demand letter from plaintiff's attorney and on the recommendation of counsel to settle directly with plaintiff fell within the protection of Rule 408). Further, the "party seeking admission of an offer under those circumstances must demonstrate convincingly that the offer was not an attempt to compromise the claim." *Pierce*, 955 F.2d at 827. "As a general matter, courts focus on whether the pertinent statement was made in attempting to persuade the plaintiff into 'abandon[ing] or modify[ing]' her suit." *Eviner*, 2015 WL 4600541, at *7 (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 909 (2d Cir. 1997)).

Here, the conversation clearly took place after litigation was commenced in October 2013. Although no attorneys were present, defendants claim the statements were made in the context of settlement discussions. The Court has reviewed the entire conversation and finds that the recording is admissible primarily because the purpose of the meeting was to discuss the Restaurant's unpaid rent and not the ongoing litigation.[17] Ciolli's testimony indicates that the initial objective of the meeting was to resolve the Restaurant's unpaid rent issue with Imbriano (Tr. 80:18-81:3, 116:07-16.) Although some portions of the conversation focus on the present dispute, there are no specific offers to end the litigation. Moreover, Ciolli never demanded that, in exchange for taking over the business, plaintiff must "abandon or modify his suit" and, examining the conversation in its totality, the Court concludes that it "cannot be considered an offer of settlement or compromise." *Lightfoot*, 110 F.3d at 909. Under the particular circumstances here, the value of the evidence outweighs "any potential for discouraging future negotiations between these or other parties which might frustrate the policies underlying Rule 408." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (2d Cir. 1999) (citing *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 510-11

---

[17] In an earlier portion, Ciolli stated to plaintiff, "So now, you would like me to fund the rent. Is that what you want? For me to pay Sal? Is that what you're looking to do?" Plaintiff responded, "I'm not saying to do anything. It's your choice, it's your store." Ciolli then says, "I don't understand it. You asked him [Imbriano] to call me for the rent. Is that what you had in mind?" (Ct. Ex. 14:16-21.)

(2d Cir. 1989)). Accordingly, the Court overrules defendants' objection and has considered the recording (Ex. 19) in reaching its decision.

## B. FLSA and NYLL Claims

Plaintiff asserts that he has not been fully compensated for his services under the FLSA and NYLL in accordance with unpaid overtime and minimum wages. In addition, plaintiff asserts that defendants retaliated against him for bringing this litigation. For the reasons set forth below, the Court finds that plaintiff has not proven, by a preponderance of the evidence, that defendants have violated the overtime, minimum wage, or anti-retaliation provisions of the FLSA and NYLL.[18]

### 1. Ciolli's Status as an Employer

Defendants argue that plaintiff's claims fail, under both the FLSA and NYLL, because Ciolli cannot be defined as an "employer." After a careful examination of the evidence, the Court concludes that plaintiff has not shown by a preponderance of the evidence that Ciolli acted as an "employer" under either the FLSA or the NYLL.

Under the FLSA, an employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d).

The NYLL defines "employer" to include "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." N.Y. Lab. Law. §§ 190(3), 651(6).

The Second Circuit has noted that the question of whether the tests for employer status are the same under the FLSA and the NYLL has not been answered by the New York Court of Appeals. *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013). However, courts in this district "have interpreted the definition of 'employer' under the New York Labor law coextensively with the definition by the FLSA." *Sethi v. Narod*, 974 F. Supp. 2d 162, 188-89 (E.D.N.Y. 2013) (quoting *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010)); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013) (noting that "[c]ourts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers" because "[t]he statutory standard for employer status under the NYLL is nearly identical to that of the FLSA" and that while "the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's," "there is no case law to the contrary" (citations omitted)); *Cruz v. Rose Assocs., LLC*, No. 13–CV–0112, 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (noting that the definitions of "employer" under the NYLL and the FLSA are coextensive (citing *Spicer*, 269 F.R.D. at 335 n.13)); *Chen v. St. Beat Sportswear, Inc.*, 364

---

[18] The parties dispute whether defendants are subject to the FLSA and whether the FLSA statute of limitations should be extended to three years due to willful violations. As discussed *infra*, the Court concludes that Ciolli was not an "employer" under the FLSA. As such, the statute of limitations issue is moot.

F. Supp. 2d 269, 278 (E.D.N.Y. 2005) ("Courts hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." (citation omitted)); *Topo v. Dhir,* No. 01–CV–10881, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) (noting that there is "general support for giving FLSA and the New York Labor Law consistent interpretations"); *Ansoumana v. Gristede's Operating Corp.,* 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003) ("[B]ecause New York Labor Law and the FLSA embody similar standards . . . I will consider the federal law in deciding whether defendants were joint employers."); *Lopez v. Silverman,* 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y.1998) (considering federal law only as to question of joint employment under federal and New York law)). Therefore, the Court will analyze the FLSA and NYLL claims under the same standard.

The Second Circuit has made clear that "'[t]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts,' and depends 'upon the circumstances of the whole activity.'" *Sethi*, 974 F. Supp. 2d at 188 (quoting *Irizarry*, 722 at 104). The Second Circuit has set forth "four factors that better determine the 'economic reality' of a putative employment relationship, specifically, 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records'" (the "*Carter* factors"). *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). The factors are not exclusive, however. *See Irizarry*, 722 F.3d at 105 ("None of the factors used in any of these cases, however, comprise a rigid rule for the identification of an FLSA employer." (citation omitted)); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d, 132, 139 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003) (holding that when determining whether one is an employer, "the overarching concern is whether the alleged employer possessed the power to control the workers in question . . . with an eye to the 'economic reality' presented by the facts of each case." (internal citation and quotation omitted)).

After considering the *Carter* factors, in light of all of the evidence in the record, the Court concludes that plaintiff has not shown by a preponderance of the evidence that Ciolli acted as an employer under either the FLSA or NYLL.

First, plaintiff had the power to hire and fire the Restaurant's employees. *See Irizarry*, 722 F.3d at 114 ("In *RSR,* we emphasized that the hiring and firing of 'individuals who were in charge of [the plaintiff employees] is a strong indication of control.'") (citing *RSR,* 172 F.3d at 140)). Plaintiff directs the Court to the fact Ciolli hired the architect, plumber, and electrician for renovations. (Pl. Prop. Find. of Law ¶ 4.) However, Ciolli credibly testified that these individuals were recommended to him by plaintiff. [19] (Tr. 42:08-24, 43:13-19, 102:18-22.) The evidence in the record demonstrates

---

[19] Ciolli made the final decision to enter into a written contract with plaintiff's suggested architect. (Tr. 42:08-24.) Ciolli also hired a plumber and an electrician for the renovations, both of whom were friends of plaintiff. (Tr. 43:13-19, 102:18-22.)

joint coordination in the hiring of these individuals.

Moreover, plaintiff interviewed and hired the Restaurant's employees without Ciolli's involvement. (Tr. 215:01-04.) Plaintiff also terminated Mr. Feldman without consulting Ciolli. (Tr. 113:10-114:07.) Plaintiff faced no consequences or demands from Ciolli as a result of this termination.[20] (Tr. 113:14-21.) Plaintiff then hired his own accounting firm, which did not report to Ciolli. (Tr. 259:20-23, 267:24-25, 260:06-09.)

Mr. DeBonis, plaintiff's own witness, credibly testified that plaintiff made the hiring decisions (Tr. 62:01-08), which was in keeping with Ciolli's arrangements at other locations where it was clear that plaintiff would be the "operator" and "run day-to-day operations." (Tr. 62:14-19.) Additionally, Ciolli, in the recorded conversation, told plaintiff that he would not fire any of *plaintiff's* employees if plaintiff accepted his offer to take over the Restaurant. (Ct. Ex. 19:02-04.) While Ciolli, in the recorded conversation, stated that he considered firing plaintiff,[21] Ciolli also stated that he has "no responsibility for what [plaintiff] do[es,]" that plaintiff was not an "employee either," and the parties had an agreement where plaintiff would run the store "for 50% of the profits." (Ct. Ex. 23:17.)

With respect to the second *Carter* factor, the evidence demonstrates that plaintiff predominately controlled the work conditions at the Restaurant. Plaintiff set the employees' work schedules (Tr. 215:01-10), and installed a time clock to ensure compliance with relevant labor law (Tr. 215:11-16), Plaintiff set his own hours and

there is no evidence that his work schedule or that of the employees (hired by plaintiff) were dictated by Ciolli. Ciolli, in fact, testified that he never set plaintiff's schedule or mandated an amount of hours either prior to or after the Restaurant opened. (Tr. 104:07-09, 76:02-14.) Plaintiff controlled payroll for all the Restaurant's employees. (Tr. 215:06-16.)

Although plaintiff copied the schedule of the Grimaldi's in Douglaston, he unilaterally made this decision without any direction from Ciolli. (Tr. 156:10-157:01.) Plaintiff also had discretion in where the Restaurant got its supplies. For example, Ciolli testified that plaintiff would "use his own people" instead of Ciolli's recommended purveyors (Tr. 48:05-12), and plaintiff, himself, testified that he chose a different coal provider due to the cost (Tr. 217:03-05). Finally, plaintiff selected the Restaurant's opening date, without Ciolli in attendance and over Ciolli's strategic concerns. (Tr. 65:17-18, 66:02-10.)

In sum, plaintiff has failed to demonstrate that Ciolli supervised and controlled employee work schedules or conditions of employment. *Carter*, 735 F.2d at 12. Instead, the credible evidence shows that plaintiff had day-to-day control over these aspects of the operation of the Restaurant.

Under the third *Carter* factor, the record lacks any evidence that Ciolli determined the rate and method of payment. While both parties do not dispute that there was a profit-sharing arrangement, plaintiff testified that Ciolli also promised him a small salary for a brief period of time, yet provided no substantive support for this contention. (Tr.

---

[20] Plaintiff testified that he viewed Mr. Feldman as Ciolli's "right-hand man." (Tr. 161:15-19.)

[21] In the Court's view, this appears to be a reference to the fact that Ciolli believed that he had the ability to

end the oral joint venture with plaintiff at any time and that Ciolli was the sole shareholder of the corporation that owned the Restaurant itself.

172:07-12, 173:6-11, 207:16-20.) The Court finds plaintiff's testimony on this issue not to be credible. Mr. Feldman also credibly testified that plaintiff "was not on the books" and there "was no salary that [he] knew of." (Tr. 224:05-09.) Tellingly, plaintiff, even while he controlled the Restaurant's payroll, never drew himself any type of salary. [22] (Tr. 172:07-12, 173:6-11, 207:16-20, 215:17-24.) As discussed *supra*, plaintiff controlled the method of payment for the Restaurant's employees, filling out and submitting the workers' compensation forms and setting their schedules. (Tr. 250:09-251:06, 215:06-16; Def. Ex. D.) Ciolli credibly testified that plaintiff interviewed all the Restaurant's employees, while setting their schedules and rates of pay. (Tr. 104:05-14.) Moreover, due to the fact that plaintiff controlled payroll and applied for permits, there is no indication that Ciolli even had the authority to sign these paychecks. [23] *See RSR,* 172 F.3d at 140. ("The key question is whether [the defendant] had the authority to sign paychecks throughout the relevant period, and he did.") Finally, in the recorded conversation, Ciolli told plaintiff that plaintiff's "involvement on a *voluntary* basis" led to extra costs for Ciolli and that plaintiff "did what [he] wanted." (Ct. Ex. 18:18-24) (emphasis added.) The recording further indicates Ciolli's ignorance as to payroll and finances, with Ciolli declaring that he did not know "what we made or didn't make" in the Restaurant. (Ct. Ex. 17:22-23); *see Irizarry*, 722 at 115 (finding it critical that defendant kept track of payroll on his accounting books in determining profit and loss).

Analysis of the final *Carter* factor also does not support a finding of an employer-employee relationship. Plaintiff, not Ciolli, maintained the Restaurant's employment records. Plaintiff testified that he completed all the workers' compensation documents that were sent to him. (Tr. 249:05-250:12, Def. Ex. 5). There is no evidence that Ciolli maintained or had any involvement with the employment records.

The Court also finds that additional evidence supports its finding that Ciolli was not an "employer" under the economic reality test. *See RSR*, 172 F.3d at 139 ("Since economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947))). Specifically, plaintiff had the sole set of keys to the Restaurant (Tr. 104:02-04); he submitted the Restaurant's required forms, listing himself as "president" or "owner" on several (Def. Exs. B, D, Pl. Exs. 11, 17, 18); appeared before town boards, without disclosing that Ciolli was, in fact, the owner of the Restaurant (Tr. 165:15-166:02, 272:05-273:01); was quoted and listed as "owner" in articles about the Restaurant (Pl. Exs. 13-15);[24] he filled out a second lease—listing himself as the owner—in an attempt to get a liquor license (Tr. 256:21-257:01, Pl. Ex. 7); and he opened and controlled the Restaurant's checking account with "free reign" (Tr. 248:14-16). Plaintiff also fired

---

[22] The Court also notes that plaintiff testified that he never requested or had his lawyer request a salary after a year-and-a-half of labor (Tr. 214:10-13) prior to the Restaurant's opening.

[23] Although Ciolli is listed as an officer on the workers' compensation forms, he did not sign them.

(Def. Ex. D.) Additionally, Ciolli testified that he never did sign any paychecks. (Tr. 103:16-17.)

[24] As the Court noted *supra*, even assuming that plaintiff did not hold himself out as the owner and/or president of the Restaurant to certain third parties, the Court's decision would be the same.

Mr. Feldman, Ciolli's "right-hand man."[25] (Tr. 113:18-114:07.)

In sum, the Court finds Ciolli was not plaintiff's employer because the economic realities demonstrate that plaintiff had control of the day-to-day operations of the Restaurant. In reaching this decision, the Court recognizes that Ciolli was involved in certain major decisions and had some control, especially due to his contractual right to use the Grimaldi name, as well as his status as the sole shareholder of the corporation that owned the Restaurant. However, the Court finds that Ciolli's ownership and involvement in certain aspects of the opening and operation of the restaurant was pursuant to the joint venture (as discussed further *infra*) that he established with plaintiff, and did not transform this joint venture into an employer/employee relationship. It is clear from the record that, in the context of this joint venture, Ciolli provided input, but day-to-day decision-making and control was in the hands of plaintiff. For example, although Ciolli approved the menu items that plaintiff wanted to add, coordinated employee training, and assisted with purveyor arrangements, there is no indication that Ciolli demanded compliance. Instead, the evidence shows that plaintiff sought out and utilized Ciolli's restaurant experience and financial support and Ciolli, in turn, was hoping to help the Restaurant be profitable pursuant to their profit-sharing arrangement.

Plaintiff argues that control is shown through the Ciolli's interactions with the Restaurant's purveyors. (Pl. Find. of Fact ¶¶ 26-27.) However, plaintiff testified that he, without Ciolli's approval or input, used a cheaper coal purveyor. (Tr. 217:03-05.) Ciolli also credibly testified that plaintiff did not hire his purveyors but "used his own people" in order to bring down costs. (Tr. 48:05-12.) In short, the Court finds that Ciolli made recommendations regarding purveyors, but not mandates. In other words, just as plaintiff suggested local contractors to assist with the renovations (Tr. 142:06-12), Ciolli suggested certain purveyors. Moreover, the evidence demonstrates that plaintiff, not just Ciolli, invested or expended substantial sums of money in the opening and operation of the Restaurant (*e.g.*, $27,976.98 in food purchases and $29,678.85 in repairs and maintenance). (Pl. Ex. 5.) Thus, although plaintiff points to Ciolli's support of the renovations as evidence that he was an "employer," the accounting report notes that plaintiff put in $29,678.85 for what the accounting firm categorized as "repairs and maintenance."

Plaintiff also highlights the fact that Ciolli trained several Restaurant employees. (Pl. Prop. Find. of Law, ECF No. 136 ¶ 4.) However, Ciolli credibly testified that he told plaintiff that this opportunity was "available" and that the Restaurant's employees went "hardly at all" and "they certainly didn't utilize what [Ciolli] thought they should have." (Tr. 50:20-51:06.)

Finally, the recording that plaintiff submitted (Pl. Ex. 19) also demonstrates that Ciolli did not have unilateral control of the Restaurant. In fact, he made an offer to "take over" the Restaurant from plaintiff. Ciolli also stated that he did not want to maintain the current arrangement whereby he is financially supporting the Restaurant without things being done "the way [he] likes it," (Ct. Ex. 30:23), again indicating his lack of

---

[25] As noted *supra*, the Court recognizes that there was a dispute as to the reason for Mr. Feldman's firing. However, the material fact is that plaintiff (regardless of the reason for the firing) had the unchecked ability to fire Ciolli's "right-hand man."

control over the day-to-day operations of the venture.

After a careful review of the evidence, the Court finds that plaintiff did not comply with several of Ciolli's suggestions; controlled the Restaurant's work schedules and conditions; held himself out as "owner" and "president" to the local community; and fired Ciolli's right-hand man, Mr. Feldman[26] without any substantial opposition from Ciolli. Therefore, the evidence does not show Ciolli had "operational control" of the Restaurant or that Ciolli's role or decisions "directly affect[ed] the nature or conditions of [plaintiff]'s employment." *Irizarry*, 722 F.3d at 110.

As discussed above, because "[c]ourts have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA," *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 n.21 (S.D.N.Y. 2011), the Court's analysis under the FLSA applies equally to the claims under the NYLL and is not addressed separately, *see Cavalotti v. Daddyo's BBQ, Inc.*, No. 15 Civ. 6469 (PKC) (VMS), 2018 WL 5456654, at *11 (E.D.N.Y. Sept. 8, 2018) (finding that defendant was an employer for NYLL liability after finding defendant to be plaintiff's employer under the FLSA).

Accordingly, plaintiff has not demonstrated by a preponderance of the evidence that Ciolli was his employer under the FLSA or NYLL.[27]

2. Joint Venture

As discussed *supra*, the Court does not find that Ciolli acted as plaintiff's "employer," but rather that the parties entered into an oral joint venture to build and operate the Restaurant and share 50/50 in the profits. Although plaintiff argues that such a joint venture is not permitted under New York law because of Ciolli's use of a corporation in connection with the ownership of the Restaurant, the Court disagrees.

"Under New York law, a joint venture is formed when (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses." *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 341 (2d Cir. 2004) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)).

When determining whether a joint venture has been formed, the Second Circuit has observed, under New York law:

> The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the

---

[26] Plaintiff testified that Mr. Feldman was "Ciolli's eyes and ears, and basically would have reported everything back to" him. (Tr. 163:16-17.)

[27] The Court also concludes with respect to the retaliation claim that, in addition to the conclusion that

the FLSA and NYLL do not apply here, there is no credible evidence that Ciolli retaliated against plaintiff for his attempt to invoke his rights under the FLSA or NYLL.

enterprise, and a provision for the sharing of profits and losses.

*Brown v. Cara,* 420 F.3d 148, 159-60 (2d Cir. 2005) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 584 (1st Dep't 2003)); *see also SCS Commc'ns, Inc.*, 360 F.3d at 341. "The absence of any one element 'is fatal to the establishment of a joint venture.'" *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citation omitted).

After a careful examination of the evidence, the Court concludes that the parties formed a joint venture. First, plaintiff and Ciolli entered into an oral agreement to open and run a Grimaldi's pizzeria. (Tr. 38:02-09, 135:24-138:25.) There is substantial evidence in the record (discussed *supra*) to support the existence of this oral agreement. Although the joint venture was not memorialized in writing, "[p]arties can evince their intent to be bound in a joint venture through a written or oral agreement." *See Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC,* No. 06-CV-3893 (JFB)(AKT), 2009 WL 875553, at *5 (E.D.N.Y. Mar. 30, 2009); *see also Zeising v. Kelly,* 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001) ("If the oral agreement entered into by the parties was a joint venture, it is not subject to the Statute of Frauds and therefore, may be enforceable." (citations omitted)). Intent need not be express but "may be implied from the totality of the conduct alleged . . . ." *Richbell Info. Servs.*, 765 N.Y.S.2d at 584 (citing *Mendelson v. Feinman,* 531 N.Y.S.2d 326, 328 (2nd Dep't 1988)); *see SCS Commc'ns,* 360 F.3d at 342; *see also Sea Carriers Corp. v. Empire Programs,*

*Inc.,* No. 04 Civ. 7395, 2008 WL 2557422 at *32 (S.D.N.Y. June 24, 2008); *DIRECTV Group, Inc. v. Darlene Inv., LLC,* No. 05 Civ. 5819(WHP), 2006 WL 2773024, at *6 (S.D.N.Y. Sept.27, 2006). As in the instant matter, where the alleged agreement is oral, parties may demonstrate their intent by combining their property and efforts in a manner such that they are necessarily subject to their joint venturers' corresponding efforts and potential failures. *See Kid Cloz, Inc.*, 320 F. Supp. 2d at 171 (citing *Zeising*, 152 F. Supp. 2d at 348).

Here, the credible testimony regarding the profit-sharing arrangement, the division of responsibilities, and the conduct of the parties (*e.g.*, Ciolli entering into the Restaurant's lease and plaintiff managing the employment and operations) demonstrates an intent to enter a joint venture. Specifically, Ciolli credibly testified that the arrangement required him to "build out the entire business" (Tr. 101:12-14), while plaintiff testified that he was in charge of "getting the place open" and "staffing the place" (Tr. 212:22-24). Moreover, as explained below, the "totality of the conduct" through the parties' contributions confirms a mutual intent to be joint venturers.

Second, both plaintiff and Ciolli contributed to the joint venture. Both individuals contributed financial resources.[28] Ciolli also contributed his knowledge and skill in the restaurant business. (Tr. 101:14-16.) As discussed *supra*, Ciolli suggested particular purveyors, provided equipment and opportunities for employee training, among other things. Plaintiff's efforts were focused on daily operations (*e.g.*, hiring staff

---

[28] Ciolli contributed over $200,000 (Tr. 77:02-03), and plaintiff invested $155,664.71 of his own (Tr. 173:20-175:17, Pl. Ex. 5). In the recorded conversation, plaintiff states that he "has money invested as well." (Ct. Ex. 22:23.)

and maintaining the schedules). (Tr. 62:14-19, 215:01-16.)

Third, the evidence shows that both parties had "some degree of joint control over the venture." *SCS Commc'ns, Inc.*, 360 F.3d at 341. For instance, Ciolli executed the lease for the Restaurant's property and allowed for the use of the Grimaldi's trademark. (Tr. 38:18-39:11, Pl. Ex. 6.) Plaintiff, in turn, controlled the internal functioning of the Restaurant, having sole authority over hiring and firing. [29] As explained, the parties collaborated on renovations, selection of purveyors, menu items, and the payment of rent.

Finally, it is clear from the record that the parties agreed to equally share in the profits (*i.e.*, 50/50). (Tr. 35:13-25, 172:04-06.) Although there was no explicit agreement on losses, the conduct of plaintiff and Ciolli demonstrated an understanding that they would share in the losses as well, including in terms of whatever money they each put into the business. Ciolli invested over $200,000 in the Restaurant prior to opening and during its operation. (Tr. 77:02-03.) Plaintiff, like Ciolli, invested a substantial amount of money (over $150,000) in the opening and operation of the Restaurant that was lost with the Restaurant's closure. (Tr. 114:15-17, 173:20-174:07, Pl. Ex. 5); *see Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV-3893 JFB AKT, 2010 WL 446042, at *8 (E.D.N.Y. Feb. 1, 2010) ("'An indispensable essential of a contract of partnership or joint venture, both under

common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses.'" (quoting *Dinaco, Inc. v. Time Warner, Inc.,* 346 F.3d 64, 68 (2d Cir. 2003)). There is no evidence that either party would disproportionality share in the profit or the losses of the Restaurant.

In sum, the evidence demonstrates that the parties formed a joint venture in connection with the opening and operation of the Restaurant. Plaintiff argues that the mere existence of a corporation, as a matter of law, abolishes any underlying joint venture. However, under the circumstances of this case, it does not.[30]

Plaintiff is correct that courts have previously held that a "joint venture may not be carried on by individuals *through* a corporate form" because the "two forms of business are mutually exclusive[.]" *Weisman v. Awnair Corp. of Am.*, 3 N.Y.S.2d 444, 449 (1957) (citations omitted). However, later precedent has narrowed the scope of *Weisman*. *See Macklem v. Marine Park Homes, Inc.*, 191 N.Y.S.2d 374, 376 (Sup. Ct. 1955), *aff'd sub nom. Macklem v. Marine Park Homes*, 191 N.Y.S.2d 545 (2d Dep't 1959), *aff'd sub nom. Macklem v. Marine Park Homes, Inc.*, 8 N.Y.2d 1076, (1960) (the joint venture remained intact where "the corporation was formed subsequent to the commencement of the joint venture merely as a conduit of title and there was never any intention on the part of [the parties] to carry

---

[29] The Court also notes that, in plaintiff's third amended complaint ("TAC"), plaintiff alleges that plaintiff and defendants "have joint control over the restaurant." (ECF No. 39 at 18.)

[30] The Court notes that this issue generally arises in the context of a party attempting to enforce the terms of a joint venture, which is not the situation in this case, where the Court is trying to determine whether an employer/employee relationship existed for purposes

of the FLSA and NYLL. In any event, the Court has analyzed the issue and concludes that a joint venture can exist in this situation. However, even if there was a legal impediment to the formation of a joint venture that would frustrate their clear intent, the Court would still conclude that no employer/employee relationship existed because the economic realities of the relationship still warrant such a conclusion (for the reasons discussed herein).

on their venture as stockholders in a corporation").

The Second Circuit has further clarified this New York law framework, holding that "[w]hen the parties *intend to merge their entire* joint venture agreement, including their rights *inter sese* and the conduct of the business enterprise planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stockholders." *Sagamore Corp. v. Diamond W. Energy Corp.*, 806 F.2d 373, 378 (2d Cir. 1986) (emphasis added) (collecting cases).

"However, when the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights *inter sese* under their agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced." *Id.* at 378-79. (citing *Arditi v. Dubitzky,* 354 F.2d 483 (2d Cir. 1965) (corporation formation pursuant to joint venture to construct high-rise apartments did not bar party from seeking accounting based on fraud in inducing him to enter agreement)); *Triggs v. Triggs,* 46 N.Y.2d 305, 306 (1978) (stock purchase agreement between organizers of a corporation, which made "no intrusion on the unfettered management of corporate affairs," enforced) (citation omitted)).

Here, there is no evidence of the parties' intent to merge their entire Restaurant venture into the corporate form. *See Arditi*, 354 F.2d at 487 (finding it notable that there was no "allegation tending to show that the parties intended their personal joint venture agreement to be merged into and carried on

by a corporation"). As Ciolli had done on two prior occasions, when opening up a new Grimaldi's location, Ciolli created the Corporation (243 Glen Cove Avenue Grimaldi Inc.) in order to protect the "Grimaldi" name as per the licensing agreement. (Tr. 29:01-03; Pl. Ex. 3.) Ciolli unilaterally created the Corporation and was its sole shareholder. (Tr. 37:09-23.) There is no evidence that plaintiff was promised or demanded shares in the Corporation. Therefore, this is not an instance where both parties held an interest in the Corporation, indicating an intent to carry out the underlying joint venture while still seeking the protections of the corporate form. *See Nasso v. Seagal*, 263 F. Supp. 2d 596, 618 (E.D.N.Y. 2003) (holding that the joint venture was no longer in existence because the parties adopted the corporate form and *both* held shares); *Bevilacque v. Ford Motor Co.*, 509 N.Y.S.2d 595 (2d Dep't 1986) (holding that the partners were not fiduciaries because *both* were shareholders of the defendant corporation.); *Berke v. Hamby*, 719 N.Y.S.2d 280, 281 (2d Dep't 2001) ("Parties may not be partners between themselves while using the corporate shield to protect themselves against personal liability.") (citation omitted); *Notar–Francesco v. Furci*, 539 N.Y.S.2d 800, 801 (2d Dep't 1989) (holding that when partners jointly formed a corporation, "the partnership agreement was a nullity" and the partners had "only the rights, duties and obligations of stockholders").

Furthermore, there is no evidence that the joint venture interfered with the rights of the Corporation or third parties. *See Paretti v. Cavalier Label Co.*, 702 F. Supp. 81, 83–84 (S.D.N.Y. 1988) ("In New York, entrepreneurs may consider themselves to be partners even though their business is organized as a corporation, so long as the partnership agreement does not interfere with the rights of third parties such as creditors."

(citing *Sagamore Corp.*, 806 F.2d at 379)); *Arditi*, 354 F.2d at 486. Specifically, there is no evidence of any "intrusion on the unfettered management of [the Corporation's] affairs" as Ciolli exclusively owned and managed the Corporation. *Triggs*, 46 N.Y.2d at 306. Moreover, the Corporation's sole function was to provide the trademark for the Restaurant, thus it was but a "mere adjunct of [the] joint venture."[31] *Sagamore Corp.*, 806 F.2d at 379 (quoting *Fromkin v. Merrall Realty, Inc.*, 225 N.Y.S.2d 632, 635 (2d Dep't 1962)). Accordingly, because there was no evidence of conflict with Ciolli's management or with any of the Corporation's creditors (*e.g.*, Imbriano as landlord), the joint venture "'runs along side of the path of the corporation' without being merged into it." *Id.* (quoting *Manacher v. Central Coal Co.*, 131 N.Y.S.2d 671, 676 (1954), *aff'd*, 125 N.E.2d 431 (1955)).

Therefore, because Ciolli was the sole shareholder (Tr. 37:09-12, 38:13-18, 80:10-12), and there is no evidence of the parties' intent to "carry on their business enterprise through the corporate form," *Weisman*, 3 N.Y.2d at 448-49, the underlying joint venture was not extinguished merely by the Corporation's formation. *Brady v. Erlanger*, 149 N.Y.S. 929 (1st Dep't 1914) (holding that the underlying joint venture remained in existence after defendant organized a corporation to purchase a theater, where plaintiff held no stock and received no dividends). In other words, while Ciolli owned the corporation, it is "quite clear that plaintiff and [Ciolli] remained co-joint adventurers to the end; the corporation acting

as alter ego for [Ciolli]." *Brady*, 149 N.Y.S. at 931.

In sum, after a careful review of all the evidence, plaintiff has not met his burden in showing that Ciolli was his employer under the FLSA and NYLL. The evidence demonstrates that the parties entered into a joint venture to operate the Restaurant for profit. The mere existence of Ciolli's corporation to facilitate this venture does not prevent the Court from so finding. Accordingly, plaintiff has failed to prove his claims under the FLSA and NYLL.[32]

### C. *Quantum Meruit* and Unjust Enrichment Claims

As a threshold matter, plaintiff's claims for unjust enrichment and *quantum meruit* were not included in the pre-trial order or the trial briefing and, thus, appear to have been abandoned.[33] In any event, plaintiff has failed to carry his burden of proof on these claims for the reasons set forth below.

Claims for unjust enrichment and *quantum meruit* may be analyzed as a single quasi-contract claim. *See, e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("Applying New York law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." (citing *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996)); *Atla-Medine v. Crompton Corp.*, No. 00 CIV 5901 HB, 2001 WL 170666, at *8 (S.D.N.Y. Feb. 21, 2001); *see also Seiden Assocs., Inc. v. ANC Holdings,*

---

[31] The Corporation, itself, did not carry out the objectives of the underlying joint venture (*i.e.*, sell pizza).

[32] Because the Court concludes that the FLSA and NYLL do not apply, it does not address the arguments regarding the executive business owner exemption.

[33] The Court notes that plaintiff makes no mention of his quantum meruit / unjust enrichment claim in his proposed findings of law (ECF No. 136), or his post-trial submission (ECF No. 139).

*Inc.*, 768 F. Supp. 89, 96 (S.D.N.Y. 1991) (explaining that "quantum meruit and unjust enrichment are not separate causes of action . . ." and that "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract"), *rev'd on other grounds,* 959 F.2d 425 (2d Cir. 1992) (internal citation omitted). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson,* 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P. C.,* 221 F.3d 59, 69 (2d Cir. 2000); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

Here, Ciolli never received any payment from the Restaurant, never withdrew any money from the Restaurant's bank account, and never received any return on his investment from the build-out of the Restaurant. (Tr. 114:8-17; 237:16-21.) Thus, Ciolli was not unjustly enriched in any manner in connection with the operation of the Restaurant. Similarly, to the extent that plaintiff seeks to recover for the time and money that he invested in the Restaurant, the Court concludes that there was no expectation of compensation for such time and money, but rather was a result of the joint venture that Ciolli and plaintiff had formed. Accordingly, plaintiff has failed to show by a preponderance of the evidence that Ciolli breached any quasi-contract with plaintiff related to the Restaurant.

### V. CONCLUSION

For the foregoing reasons, the Court concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that plaintiff has not shown by a preponderance of the evidence that defendants violated the minimum wage, overtime, and anti-retaliation provisions of the FLSA and NYLL. Nor has plaintiff shown by a preponderance of the evidence that he is entitled to relief in quasi-contract (*i.e., quantum meruit* and unjust enrichment) between the parties. The Clerk of the Court shall enter judgment in favor of the defendants on all claims.

SO ORDERED.

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: September 6, 2019
Central Islip, NY

\* \* \*

Plaintiff is represented by Douglas Brian Lipsky, Lipsky Lowe LLP, 630 Third Avenue, Fifth Floor, New York, NY 10017. Defendants are represented by Vito A. Palmieri, Palmieri, Castiglione & Associates, PC, 250 Mineola Boulevard, Second Floor, Mineola, NY 11501.